**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION -- LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>    **Plaintiff,**<br><br>v.<br><br>**JEREMY LAMONT DUNCAN,**<br>    **Defendant.** | **CRIMINAL ACTION NO. 5:20-49-KKC-MAS**<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant Jeremy Lamont Duncan's motion to suppress evidence seized pursuant to a search warrant. (DE 19.) On September 8, 2020, the Court conducted a hearing on the motion. (DE 26.) For the following reasons, the Court will deny the motion.

**I.   Facts**

On September 26, 2019, the Lexington Police Department's Narcotics Enforcement Unit received a tip about possible narcotics trafficking activity at 315 Ballpark Drive, apartment #4 and set up surveillance for several hours near the apartment. During the surveillance, Detective Brian Cobb observed numerous individuals and vehicles arriving to the area adjacent to the apartment and quickly leaving, behavior indicative of possible narcotics activity. The detectives also conducted traffic stops on visitors leaving the apartment that night. Upon stopping one visitor, detectives found two firearms and large sums of cash. Another traffic stop yielded narcotics.

Following the traffic stop, officers executed a controlled buy from apartment #4 through a confidential informant. The confidential informant described the individual from whom he purchased the suspected narcotics as a black male having short hair, black pants,

1

a black t-shirt, and distinguishable glasses. At the time, detectives did not apply for a warrant because they were continuing their investigation into which other individuals were involved in the suspected narcotics trafficking.

Shortly after midnight on September 28, 2019, the Lexington Police Department received a narcotic trafficking complaint against apartment #4 from neighbors and dispatched Officers Miller Owens and Christopher Qualls to 315 Ballpark Drive. After confirming the location of apartment #4 with the complainants, the officers moved toward apartment #4.

Upon arrival to apartment #4, Officer Qualls knocked on the apartment door, as Officer Owens approached the apartment's front exterior window. The interior apartment lights were on. Officers Owens then looked through a gap in the window between the windowpane and the drawn window blinds. There, he observed a female occupant, later identified as Raechel Murphy, moving baggies of suspected narcotics and cash. The officers then switched places, allowing Officer Qualls to see through the window slit. By looking between the small openings in the window, Officer Qualls also observed Murphy moving a suspected baggie of marijuana, apparently hiding the baggie in a trash can, and wiping away a white powdery substance from the table. He also saw a large amount of cash on top of the microwave. At some point, the interior lights were turned off, and Officer Owens shone his flashlight into the window.

Charles Raglin, an older male occupant of the apartment, eventually answered the door. Soon after, Defendant and Murphy approached the doorway. Defendant matched the description of the individual from the controlled buy, wearing a black t-shirt, tight pants, and glasses. The officers explained that they were investigating a narcotics complaint.

Defendant repeatedly told the officers that they could not come into the apartment. Defendant continuously attempted to exit the apartment and shut the front door, which

officers prohibited. After his final attempt to shut the door, the officers handcuffed Defendant, and while detaining him, there was a brief physical altercation between Murphy and Officer Owens in the apartment doorway. Officer Qualls followed Murphy into the apartment and turned on the interior lights. While inside, Officer Qualls saw a suspected marijuana grinder and marijuana blunts on a table.

Officer Owens subsequently followed Raglin inside the apartment and into an unlit hallway, discovering two additional individuals in the bathroom. Officer Owens exited the apartment but later reentered it to accompany Raglin in retrieving his cane from the kitchen. In the kitchen, Officer Owens observed a bag with a powdery substance in a large Pyrex cup on the floor. Officer Owens then exited the apartment, following the other officers and the residents. After detaining the occupants outside of the apartment, the officers requested assistance from the narcotics division.

Thereafter, Detectives Brian Cobb and Rob Sinnott from the narcotics division arrived at the scene for assistance. Officer Qualls exited the apartment and reentered the apartment with the detectives once more to explain to them what he had observed inside of the apartment. During this time, Officer Qualls observed a baggie containing a white powdery substance on the kitchen floor. Detective Cobb noticed the same baggie and suspected fentanyl on the table. The detectives left the scene to apply for a search warrant and returned with the warrant several hours later.

In his affidavit supporting the issuance of the search warrant, Detective Cobb stated that he believed that "further evidence of drug trafficking, possession or use of illegal narcotics and firearms will be located upon immediate search of the premises known and identified as 315 Ballpark Drive #4, Lexington, Fayette County, Kentucky 40505." (DE 19-4 at 6.) This belief was based on the following information listed in the affidavit:

3

- When he was conducting surveillance on apartment #4 on September 26, 2019, Detective Cobb observed numerous subjects arrive to the apartment complex, proceed in the direction of apartment, and return to their vehicles shortly thereafter. This behavior was indicative of narcotics trafficking. (DE 19-4 at 5.)

- In conducting traffic stops on subjects leaving the apartment complex that night, officers found an individual in possession of two handguns and a large sum of cash. In a separate traffic stop, officers found two other subjects with narcotics. (DE 19-4 at 5.)

- Following the traffic stops, officers conducted a controlled buy through a confidential informant at the apartment. The confidential informant purchased the suspected narcotics from an individual having short hair and wearing black jeans, a black t-shirt, and black framed glasses. (DE 19-4 at 5.)

- While responding to a potential narcotics complaint against apartment #4 on September 28, 2019, Officer Qualls observed plastic bags and money on a table. He also noticed an individual wiping items off the top of a table and placing items into a trash can. The subjects then turned off the interior lights and attempted to block the view of the residence's interior. (DE 19-4 at 6.)

- Inside the apartment, Detectives Cobb and Sinnott observed a clear bag of suspected fentanyl on the floor, suspected fentanyl on the table, money on top of a microwave, and a box of sandwich bags. (DE 19-4 at 6.)

Following the issuance of the search warrant, officers executed a further search of the apartment, locating three firearms, magazines, ammunition, baggies, approximately 325

grams of fentanyl, and two empty boxes for firearms with serial numbers matching the firearms found on the individual from the traffic stop. (DE 20 at 6.)

Defendant was subsequently charged with various crimes regarding the possession of a firearm and the possession and distribution of fentanyl and cocaine. (DE 1.) On July 18, 2020, Defendant filed a motion to suppress the evidence obtained pursuant to the search warrant (DE 19), and the Court subsequently held the suppression hearing on September 8, 2020 (DE 26).

### II.     Analysis

In seeking the suppression of evidence obtained from an allegedly unconstitutional search, the defendant has the burden to prove a violation of his constitutional rights. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). If the defendant proves a violation of his constitutional rights, the exclusionary rule renders all evidence obtained from the unconstitutional search inadmissible. *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008). The admissibility of evidence derivatively obtained from the unconstitutional search is also barred under the "fruit of the poisonous tree" doctrine. *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

### A.     Whether the Searches Conducted Prior to the Warrant Were Constitutional

Although Defendant does not specify in his motion what specific officer conduct constituted a search, Defendant argues that the officers violated his Fourth Amendment rights when they entered his home without his consent and without a search warrant. (DE 19-1 at 4.) Further, the officers conducted a warrantless search by peering into the apartment window. Accordingly, Defendant contends that the evidence acquired from the search warrant should be suppressed because it was initially obtained from a warrantless search in violation of the Fourth Amendment. (DE 19-1 at 5.) In response, the Government

5

argues that the searches conducted prior to the issuance of the search warrant were permissible under the plain view and exigent circumstances doctrines. (DE 20 at 9-13.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. A search occurs when the government gathers information by conducting an unlicensed, physical intrusion into a constitutionally protected area such as the home. *See Florida v. Jardines*, 569 U.S. 1, 5-6 (2013). Any warrantless search into the home is presumptively unreasonable and therefore, unconstitutional, unless an exception to the warrant requirement applies. *See Payton v. New York*, 445 U.S. 573, 586-90 (1980).

The Fourth Amendment protections available to the home apply with equal force to the curtilage—"the area 'immediately surrounding and associated with the home.'" *Morgan v. Fairfield Cty.*, 903 F.3d 553, 561 (6th Cir. 2018) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Thus, "officers' entry onto the curtilage [may] be justified only by a warrant or one of the recognized exceptions to the warrant requirement." *Id.* at 562. In determining whether an area falls within a home's curtilage, courts consider four factors: (1) the proximity of the area to the home, (2) whether the area is within an enclosure around the home, (3) how that area is used, and (4) what the owner has done to protect the area from observation from passersby. *Id.* at 561. These factors are not applied mechanically but are only useful to the extent that they establish "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* (internal citation and quotation marks omitted).

Without the consent of the residents and without a warrant, law enforcement conducted multiple unconstitutional searches on September 28th by entering apartment #4 and peeping through its exterior window. The officers' actions constituted searches because they exceeded the license typically afforded to visitors when they physically intruded beyond

6

the façade of the apartment, a constitutionally protected area. *Cf. Jardines*, 569 U.S. at 8 (2013) ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."). Given that law enforcement searched the apartment before a warrant was issued, the searches were presumptively unreasonable, and, since no warrant exceptions apply except in a single instance, unconstitutional. Therefore, all evidence directly or derivatively obtained solely from the unconstitutional searches is inadmissible.

First, Officer Qualls unconstitutionally searched the apartment by following Murphy into the residence after her physical altercation with Officer Owens and turning on the apartment lights to enhance his line of sight. At this point, the interaction between Murphy and Officer Owens had de-escalated, and all known occupants were either detained or within the officers' field of vision. Accordingly, exigent circumstances did not exist. *See Kentucky v. King*, 563 U.S. 452, 470 (2011) ("Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency."). Since Officer Qualls violated the Fourth Amendment the moment that he stepped foot into the apartment, the Government also cannot rely on the plain view doctrine because "[t]he plain-view exception . . . applies only when the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed." *Morgan*, 903 F.3d at 563 (internal citation and quotation marks omitted). Therefore, the evidence of the marijuana grinders and blunts that he observed in plain view is suppressed.

Further, law enforcement performed an unconstitutional search when they breached the apartment's doorway once again to discuss the warrant before it was issued. Any potential exigencies had completely diminished, as all subjects were then detained outside of the apartment and out of reach of any evidence or weapon. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990) (exigency in scanning area for potentially dangerous individuals); *King*, 563

7

U.S. 452 at 460 (exigency in "prevent[ing] the imminent destruction of evidence") (internal citation and quotation marks omitted). As above, the plain view doctrine is inapplicable because law enforcement could only observe the suspected fentanyl, cash, and sandwich bags by violating the Fourth Amendment in the first place. *See Morgan*, 903 F.3d at 563. Thus, this evidence is also suppressed.

However, any evidence that Officer Owens observed in following Raglin into the unlit apartment hallway and into the kitchen to retrieve his cane is admissible. Under *Maryland v. Buie*, an officer may constitutionally conduct a protective sweep of the home if the officer has "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others." 494 U.S. at 327 (internal citations and quotation marks omitted). Because Raglin walked down the unlit hallway in an apartment where officers suspected that narcotics activity occurred and firearms were held, Officer Owens could have rationally inferred that the area contained potentially dangerous individuals. When Officer Owens followed Raglin into the bathroom, he, in fact, discovered two additional occupants. Therefore, the bag containing a powdery substance in a Pyrex cup that Officer Owens observed in plain view is admissible.

Finally, Officer Owens and Officer Qualls also unconstitutionally searched the apartment by looking through the apartment's window, which formed part of the home's curtilage. The window is "immediately . . . associated with the home," forming part of the apartment's exterior. *See Morgan*, 903 F.3d at 561 (internal citation and quotation marks omitted). Because the window abutted the apartment, it was directly proximate to the home. While the window was not in an area of enclosure around the home, its attachment to the apartment less than an "arm's-length" from the apartment made the window a "classic exemplar of an area adjacent to the home and to which the activity of home life extends." *Id.*

8

(internal citations and quotation marks omitted). Notably, the apartment's owner had protected the window from outside observation by placing blinds inside the windowpane and drawing them closed. Indeed, the Fourth Amendment right to be free from unreasonable governmental intrusion is "of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the *front window*." *Jardines*, 569 U.S. at 6 (emphasis added). Yet both Officers Owens and Qualls still peered through the small space between the blinds and the window, even using a flashlight to shine light into the space. In doing so without a warrant, the officers conducted an unconstitutional search of the apartment's curtilage.

The Government argues that the officers saw the suspected narcotics and cash in plain view through the exterior window, and therefore, this evidence is admissible. (DE 20 at 10.) But because the officers violated the Fourth Amendment by looking through the window without a warrant, the Government cannot take advantage of this doctrine. *See Morgan*, 903 F.3d at 563. No other exception to the warrant requirement applies. Based solely on this unconstitutional search, the plain view evidence seen through the window is suppressed.

**B.     Whether the Search Warrant Was Adequately Supported by Probable Cause**

Defendant further contends that the search warrant itself was void of probable cause since the information in the supporting affidavit was obtained from the warrantless search. (DE 19-1 at 5.) The Government argues that even if the searches were unconstitutional, independent probable cause existed, based on the events on September 26th and the officers' observations outside of the apartment. (DE 20 at 13.)

The Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched,

9

and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion[.]" *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (internal citation and quotation marks omitted). To determine if a supporting affidavit was sufficient to issue a search warrant, courts employ a "totality of the circumstances" test to answer "'the commonsense, practical question [of] whether there is probable cause to believe that contraband or evidence is located in a particular place[.]" *United States v. Pinson*, 321 F.3d 558, 562 (6th Cir. 2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983) (internal quotation marks omitted)).

When a search warrant was issued based on both illegally and legally obtained information, the evidence obtained is still admissible if the government shows that it was discovered through sources "'wholly independent of any constitutional violation.'" *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (quoting *Nix v. Williams*, 467 U.S. 431, 442-43 (1984)). For this so-called "independent source doctrine'" to apply, the government must make two showings by a preponderance of the evidence: (1) the initial illegal search did not prompt officers to seek a warrant for a second search, and (2) a neutral magistrate would have issued the search warrant even if never presented with the illegally obtained information. *Murray v. United States*, 487 U.S. 533, 542 (1988); *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009). To determine if a neutral magistrate would have still issued the search warrant, courts excise the illegally obtained information from the affidavit and decide whether the remaining legally obtained information sufficiently supports a finding of probable cause. *United States v. Williams*, 656 F. App'x 751, 753 (6th Cir. 2016). Under the related inevitable discovery doctrine, "the exclusionary rule is inapplicable, even if the initial search [was] unlawful, as to evidence that inevitably would have been discovered by lawful

means." *United States v. Akridge*, 346 F.3d 618, 623 (6th Cir. 2003) (citing *Murray,* 487 U.S. at 539 ("The inevitable discovery doctrine . . . is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.") (emphasis in original)).

Although the officers' unconstitutional searches of the apartment would generally render the illegally obtained evidence inadmissible, the search warrant still established probable cause to believe that evidence of drug trafficking, narcotics activity, and illegal firearms would be found in apartment #4. While the search warrant was based, in part, on the illegally obtained evidence from September 28th, officers still found the illegally obtained evidence from an independent source—specifically, the evidence legally obtained on September 26th and 28th. Even if the unconstitutional searches had not occurred, the evidence would have been inevitably discovered through the ongoing narcotics investigation into apartment #4. Therefore, the otherwise suppressed evidence is admissible.

The legally obtained evidence constitutes an independent source of the evidence seized because officers' initial illegal searches into apartment #4 did not prompt the officers to seek a warrant for a second search or take any action that they were not already planning to take. Law enforcement had merely decided to broaden their investigation into potential narcotics trafficking within the apartment before obtaining a warrant. The fact that the officers did not seek a warrant initially following the events of September 26th does not mean that they could not have obtained one at that time. Officers would have certainly pursued a warrant after concluding their investigation. Moreover, the tip about narcotics activity on September 28th was separate from that on the September 26th.

Moreover, a neutral magistrate would have still issued a search warrant, even if the supporting affidavit did not contain the illegally obtained evidence. Excising the evidence

11

illegally obtained from the officers peering through the window, entering the apartment behind Murphy, and conferring about the warrant inside the residence, the legally obtained evidence still supports a finding of probable cause. The remaining affidavit would contain evidence of the initial narcotics trafficking tip, surveillance indicating suspicious activity in the apartment, the traffic stop that yielded multiple firearms from an apartment visitor, an additional traffic stop that produced narcotics, the controlled buy in the same apartment from an individual matching the description of Defendant, a subsequent narcotics tip on September 28th, the residents' repeated resistance to the responding officers on September 28th, and the officers' knock and talk with occupants during which time the interior lights turned off. This evidence is more than enough to exceed the probable cause threshold. The evidence gathered from the execution of the search warrant was still discovered from sources independent of the unconstitutional searches and is thus admissible.

Because law enforcement would have inevitably sought a search warrant based solely on the evidence gathered from September 26th and the related investigation (in addition to the events on September 28th), any evidence produced from the unconstitutional searches would have been inevitably discovered in executing that search warrant. Based on the events on September 26th alone, including the surveillance, traffic stops, and the controlled buy, officers had sufficient evidence to adequately establish probable cause, obtain a warrant, and consequently, lawfully discover the evidence. Therefore, the evidence seized pursuant to the search warrant is admissible.

### B.   Conclusion

For all these reasons, the Court hereby ORDERS that Defendant's motion to suppress (DE 19) is DENIED.

Dated September 29, 2020



KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY